**In re NASHUA TRUST COMPANY, Debtor.**

**In re NATCO FINANCE COMPANY, Debtor.**

**Bankruptcy No. 86–05645.**

United States Bankruptcy Court, D. New Jersey.

April 29, 1987.

Crummy, Del Deo, Dolan, Griffinger & Vecchione by Paul R. DeFilippo, Newark, N.J., for trustee.

Hebb & Gitlin by Evan D. Flaschen and David G. Hetzel, Hartford, Conn., for Barclay's American/Business Credit Inc.

Lehman & Wasserman by Robert B. Wasserman, Millburn, N.J., for Official Ltd. Partners' Committee.

Ravin, Sarasohn, Cook, Baumgarten, Fisch & Baime by Sharon L. Levine, Roseland, N.J., for Official Unsecured Creditors' Committee.

## OPINION

ROSEMARY GAMBARDELLA, Bankruptcy Judge.

Before the court is a Notice of Motion filed by Barclay's American/Business Credit Inc. (Barclays) for relief from the automatic stay to enforce its rights and remedies with respect to certain negotiable promissory notes (Investor Notes) issued by various limited partners in connection with their investment in various limited partnerships and subsequently pledged to Barclays as security for the indebtedness of NATCO Finance Co. and Nashua Trust Company, debtors herein, to Barclays. This motion is opposed by the Trustee, the Unsecured Creditors' Committee of NATCO, and the Official Limited Partners' Committee of Nashua Trust Company.

Pursuant to a certain General Loan and Security Agreement dated as of September 23, 1984, as amended May 16, 1984, July 27, 1984 and September 20, 1985, Barclays agreed to provide certain financial accommodations to Consolidated Mortgage Co. (Consolidated) and NATCO Finance Company (NATCO Finance), two affiliates of Nashua Trust Company (NATCO). The loan as evidenced by a certain Amended and Restated Secured Promissory Note dated September 20, 1985 was in the original amount of $15,000,000.00. Pursuant to a certain Continuing Guaranty Agreement dated September 20, 1985, Nashua Trust Company guaranteed to Barclay's "the due

and punctual payment, performance and discharge" by NATCO Finance of all its debts, obligations and liabilities to or held by Barclays, then existing or thereafter arising, including the obligations due with respect to the aforesaid Loan Agreement and Promissory Note. These obligations are secured by certain negotiable promissory notes (or Investor Notes) and the proceeds thereof. In early 1984 Barclays began a lending relationship with Consolidated, a predecessor entity to NATCO, which continued until early 1986. In September 1985 NATCO became a co-borrower with Consolidated on the Barclays loan.

These Investor Notes were originally issued by various limited partners in connection with their investments in various limited partnerships. These Investor Notes were pledged to Barclays by either Consolidated or NATCO Finance. Barclays has at all relevant times held actual possession of the Investor Notes. The Investor Notes are divided into two categories:

1. Approximately 58 Investor Notes were pledged by Consolidated to Barclays (Consolidated Notes). These notes were issued by investors in connection with their investments in various limited partnerships not connected to the "Boardwalk Project", the latter dealt with below. These notes were pledged by Consolidated to Barclays in 1984 and 1985. The aggregate principal balance of the Consolidated Notes as of July 31, 1986 was $3,978,371.11.

By an Agreement dated December 31, 1985 Consolidated assigned its equity in "certain investor promissory notes" pledged to Barclays to NATCO.

2. Approximately 132 Investor Notes pledged and negotiated by NATCO Finance to Barclays (Boardwalk Notes). These notes were issued by individual investors in connection with their investments in various limited partnerships involved in real estate development projects in Atlantic City, New Jersey, collectively known as the "Boardwalk Project." The aggregate principal balance of the Boardwalk Notes as of September 30, 1986 was $8,251,363.64.

The September 20, 1985 Promissory Note carries interest equal to 4% in excess of the "Prevailing Prime Rate." Interest presently continues to accrue on the Promissory Note at the default rate under the Promissory Note of 6% over the "Prevailing Prime Rate." Attorneys fees and costs incurred as a result of default are also recoverable by Barclays under the Loan Documents.

Substantially all of the Investor Notes are currently in default and the subject of litigation as will be outlined below.

By two consensual orders of this court dated November 5, 1986, Barclays was granted partial relief from the automatic stay to continue to enforce its rights with respect to all the Investor Notes, and the proceeds thereof, and so are presently able to participate in lawsuits involving the Investor Notes and to apply to the obligations due all payments made on the Investor Notes. Barclays, however, is presently stayed from foreclosing on the Investor Notes themselves.

Norman E. Rodgers, Jr., Esquire, counsel to Barclays, testified at the April 2, 1987 hearing before this court. Rodgers is counsel to the commercial loan division of Barclays and testified to the following: Rodgers supervises the collection of debts. In July 1986 Barclays began sending out demand letters to all defaulting investors. (Exhibit "O" to Stipulation, B-1). (Transcript of April 2, 1987 at 9) (hereinafter Tr. at " "). Barclays received "very few" responses. (Tr. at 10). From August 1986 to October 1986, 40–70 investors were called by Barclays. (Tr. at 10). In September 1986 Barclays began filing lawsuits to collect on the notes. (Tr. at 12). To date Barclays has settled 2 cases for 40–45% of the remaining outstanding balance of the notes. (Tr. at 11). Rodgers testified that it is "difficult to get past talking about settlement terms" due to Barclays inability to return the Notes to the Investors marked paid in full. (Tr. at 12). Approximately 100 lawsuits have been commenced by Barclays against note obligors and by May 1, 1987, Barclays will have sued every defaulted investor. (Tr. at 12). Barclays has been named a defendant in 16 actions brought by the individual investors individually and on behalf of other investors to

avoid liability under the Investor Notes. (Tr. at 12). Two (2) of these lawsuits involve the Consolidated Notes, and fourteen (14) of these lawsuits involve the Boardwalk Notes. (Tr. at 42–43). These latter 14 cases have been consolidated in the United States District Court for the District of Connecticut and applications are pending for classification of these suits as class action suits. (Tr. at 15, 43). The defendants in these latter actions are the promotors and syndicators including NATCO Finance, other NATCO affiliates and their principals, their accountants and lawyers, and as a second group the lenders, including Barclays, who took these notes. The complaints request, among other things, rescission of the plaintiffs' notes by reason of alleged misrepresentation made by the principal defendants. Contained in these same complaints are allegations that Barclays is not a holder in due course of the Notes because Barclays knew or should have known of certain of the alleged misrepresentations made by the principal defendants to the plaintiffs. (B–1). Rodgers testified that the litigation is at a "preliminary stage." (Tr. at 15). There has been some discovery but most discovery has not yet begun. (Tr. at 15). In the actions seeking class certification, the classes have not yet been certified. (Tr. at 15). The pleadings have not been closed in any of these cases. (Tr. at 15). Barclays will be a party litigant in connection with all the defaulted Investor Notes as plaintiff in suits against the individual obligors on 100 notes, and as a defendant in actions brought by approximately 82 note obligors, in which Barclays intends to counterclaim for the amount of the notes. (Tr. at 55–56). Rodgers testified, however, that involved in every one of the pending suits is Barclays status as a holder in due course of the Notes. (Tr. at 60). Rodgers testified that the Notes have been in the continuous possession of Barclays since the loan was initiated in 1984 and over the course of time the Notes were pledged to Barclays. (Tr. at 18).

Rodgers testified that the principal debt due to Barclays as of January 31, 1987 was $5,762,000.00. (Tr. at 18). Interest has accrued of approximately $80,000.00. (Tr. at 18). Barclays has incurred attorneys fees of $281,000.00 for the year 1986, and for the year 1987, through February 1987, attorneys fees of over $100,000.00, and attorneys fees are accruing at at least $50,000.00 per month, with probable increases due to increased activity in the pending litigation. (Tr. at 18–19). The interest is accuring on the principal outstanding of approximately $5,800,000.00 at a *per diem* rate of $2,161.00 or $788,783.00 annually based upon an interest rate of 13.5% *per annum*. (Tr. at 20). The Affidavit of Michael Weissman, a Vice-President of Barclays dated October 8, 1986 and submitted in support of the within motion states that as of September 30, 1986 the principal and interest calculated at the non-defaulted rate owing on the Promissory Note was $6,054,516.16. Rodgers estimated that assuming Barclays went to trial in the pending litigation, final judgments would not be obtained for 3–4 years, excluding the time to execute or collect on any judgments, and that in 2 years the debt to Barclays will have increased to $8,900,000.00, 3 years to $10,300,000.00 and in four years to $11,700,000.00. (Tr. at 21).

A Subordination Agreement dated November 13, 1984 was entered into between JLB Equities Inc. and/or Jay Botchman, Consolidated Mortgage Company and Barclays wherein JLB Equities purported to take a junior position in "all Notes Receivables now or hereafter delivered to [Barclays] in connection with that certain General Loan and Security Agreement dated March 23, 1984 and as amended thereafter" along with other property of Consolidated Mortgage Co., on account of an indebtedness purportedly owing by Consolidated to JLB Equities in the sum of $1,350,000.00 (B–2). Rodgers was unaware of any instrument giving JLB Equities a claim to the Notes except for the Subordination Agreement. (B–2). (Tr. at 31). Rodgers admitted that in its lawsuits Barclays is seeking outstanding principal and accrued interest on the Notes at a rate of 13.50% per annum, calculated as prime plus 6%, the default rate under the Notes, along

with costs of collection and attorneys fees. (Tr. at 33, 35, 36).

Thomas J. Axon also testified before this court. Mr. Axon is President of RMTS Corp., RMTS Associates and Strategic Economics. Axon negotiates and develops loans for sponsors utilizing his contacts with lenders, and acts as an agent or processor for banks. (Tr. at 81). Axon performs "preliminary due diligence" for the lending institutions in question, including investigating the viability of the sponsor, the credit worthiness of the individual investors, and the viability of the deal itself. (Tr. at 89). Axon testified that he had never rendered an opinion on the value of a portfolio of investor notes, but had experience in placing and pricing loan portfolios and recommending terms and conditions of certain loan portfolios, including defaulted portfolios. (Tr. at 77, 85, 100, 101). The court qualified him as an expert in pricing, terms and conditions of loan portfolios, both new portfolios and portfolios in default. (Tr. at 110).

Axon testified to numerous factors involved in evaluating a loan portfolio as follows:

1. the sponsor;

2. the deal itself;

3. the investors;

4. the quality of the loan documents;

5. if the notes are seasoned, the history of repayment;

6. if defaults exist, the time to collect or remedy defaults;

7. litigation.

(Tr. at 113–117).

Axon reviewed a sampling of 35 investor notes in this case. (Tr. at 122). Applying these 7 factors to those transactions, and employing a rating system of zero through ten, he found as follows:

1. The lack of a strong, experienced reliable sponsor—near zero rating. (Tr. 124–125).

2. The deal itself—rating close to zero. (Tr. at 127).

3. The investors—Although the investors demonstrated an ability to repay, their willingness to repay was "not very great" explaining "when the deal goes sour, they have the resources and they have the guts to fight, because they're fighters to begin with. They have their own businesses." (Tr. at 130, 131). Axon did admit, however, that these investors were "ideal, for the most part." (Transcript at 132), but rated 6 out of 10. (Tr. at 137).

4. The quality of the loan documents—a little below average, rated about 4 out of 10. (Tr. at 135).

5. aging schedule—zero, since only 2 investors are current and 2 have settled. (Tr. at 136).

6. collection efforts and litigation factor —1 out of 10. (Tr. at 137).

Axon testified that "it would be impossible to price it (this portfolio) because in today's market and given the particular circumstances of this portfolio, there is not a market." (Tr. at 140).

Axon testified that if Barclays brought back the Notes they would have a value of $3.7 million assuming Barclays had all weapons at its disposal to collect these notes, legal and economic. If there existed legal defenses why Barclays could not collect on the notes, the value would be less than $3.7 million. (Tr. at 150, 152, 168). If Barclays agreed to full recourse on the Notes to indemnify a third party purchaser, the price of the notes would be much higher. (Tr. at 150).

Axon testified that the Notes had no sale value, but had "value if Barclays retains it and continues to try to go forward with its collection activities." (Tr. at 144). Axon based the value of $3.7 million upon the premise that Barclays would begin negotiations with an investor at 50% of the full amount of the notes, discounted the face amount of the notes to $6 million, and applied a 11% discount rate against that figure assuming an average three year pay-out and $1 million in attorneys fees expended over that time by Barclays. (Tr. at 151–154). Axon admitted that the possibility of recapture of federal income tax deductions was an incentive for an investor to pay a note, as was the desire of an

investor to protect his or her own credit rating. (Tr. at 149, 158).

Jack Birnberg, the principal of Jack Birnberg & Associates, the Trustee of NATCO and its affiliated and related cases, also testified. These cases are proceeding under Chapter 11 of the Bankruptcy Code.

On June 5, 1986 NATCO filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas and continued thereafter as a debtor-in-possession. On September 4, 1986 Jack Birnberg Inc. was appointed Trustee for the NATCO estate by the United States Trustee. On October 8, 1986, by amended notice of appointment, Jack Birnberg & Associates, Inc. was appointed Trustee of the NATCO estate by the United States Trustee. By order dated September 4, 1986 the venue of the matter was transferred to the United States Bankruptcy Court for the District of New Jersey.

On September 5, 1986 the Trustee, Birnberg, filed voluntary Chapter 11 petitions on behalf of eight limited partnerships formed by NATCO in this court. On October 6, 1986 Birnberg was appointed Trustee of each of these NATCO entities. On October 31, 1986 the NATCO proceedings were extended over 43 additional NATCO subsidiaries, including NATCO Finance, and Birnberg was appointed Trustee of each of these entities. NATCO and its affiliates are engaged in the business of real estate development. NATCO, through numerous partnerships, subsidiaries and affiliates was the proposed developer of a project known as the Boardwalk Marketplace, a development of non-casino hotels and shops in a three-square block areas of Atlantic City, New Jersey.

Birnberg testified that it was his present intention as Trustee to reorganize all these cases. (Tr. at 181). No plan of reorganization has been drafted. (Tr. at 182). The Trustee is still implementing the investigations, seeking the turnover of assets, and reconstructing the estate. (Tr. at 182). The Trustee "envisions" a public company in the business of real estate made up of the creditors, and the limited partners of all the corporations making up the NATCO cases. (Tr. at 181). The Trustee testified that he would not give a proper timetable for a plan of reorganization because he could not estimate how long it was going to take to marshal assets and restructure and reorganize the debtors' affairs. (Tr. at 183).

Birnberg testified that the role of the Investor Notes to the NATCO reorganization are in the form of potential cash to the estate based upon equity in the Notes. (Tr. at 198). Birnberg also testified that if there were no value to these Notes the estate would nonetheless be able to reorganize. (Tr. at 200).

The Trustee also stated that from his own review of the note documents, and a summary of investors' profiles, with a few exceptions, the Notes were "100 percent collectable" based upon the individual investors' net worth, income, and credit ratings as that information presently existing in the investor files, and was obtained in 1984 and 1985. (Tr. at 208–209).

Deposition testimony of Herbert B. Hirsch, taken February 16, 1987 was also presented. (Exhibit T–3). Hirsch was at that time President of the Special Finance Division of Barclays and Executive Vice President of Barclays. Hirsch testified that under the relevant documents Barclays had broad discretion to reject notes that were offered where the maker did not have satisfactory credit worthiness, and in fact, rejected many notes, (Exhibit T–3, p. 38–39), that Barclays tried to make sure that the maker had the ability to pay and looked to the makers' income, other debt, taxable income, and net worth, (Exhibit T–3, p. 40); that when Barclays got an assignment of a note, it was satisfied the note existed, and that the maker had the ability to pay, and presumably the willingness to pay. (Exhibit T–3, p. 43). Hirsch did not know if the debt to JLB Equities still existed (Deposition, p. 46), and stated that Jay Botchman had never given Barclays notice that he claimed a subordinated position in the collateralized notes (Exhibit T–3, p. 47), and Hirsch had never personally seen any underlying evidence of indebt-

edness between Consolidated and Botchman or JLB equities. (Exhibit T–3, p. 49). Hirsch testified that Barclays warehoused these notes for Consolidated and later NATCO Finance by taking an assignment of the notes and advancing 50% of the then principal balance of the note, and retaining 75% of the collections to pay principal and interest, returning 25% to the borrower provided there were no defaults and no delinquent accounts to be replaced. Hirsch testified that if the notes were accepted by Barclays they were judged to be consistent of quality and sufficient to support the advance made at the time. (Exhibit T–3, p. 122). Barclays never requested a guaranty of the Consolidated loan from Jay Botchman or any other individual. (Exhibit T–3, p. 61). In May 1985 the accommodation with Consolidated was revised by Barclays to create a revolving demand facility of up to $15 million, with Barclays' share no higher than $7 million. (Exhibit T–3, pp. 53, 85–86). Hirsch testified that prior to Barclays making a loan to Consolidated it looked strictly to the creditworthiness of the individual obligors under the notes and not to what any individual was doing with the funds, and that Barclays was lending "strictly against his credit for repayment." (Exhibit T–3, p. 125).

The court notes that the Consolidated Mortgage Company Pre-Closing Audit memorandum, dated March 1984 stated:

*Delinquent Notes*

As of 2/29/84, $124,303 in notes was thirty days delinquent. This represents .9% of the total notes outstanding (over $13mm) at this time. Of over $28mm in notes that were structured similar to these notes, which involve a limited partnership receiving the proceeds of the notes, only one obligor defaulted as a result of connubial problems. According to the Company, the major reason, causing an investor to default, would be due to similar problems. No ready market exists to resell these notes, should an investor default.

Since the investors/obligors in these transactions are seeking to shelter their incomes, the tax consequences of defaulting on these notes are so severe (recapture of past deductions/write-offs as ordinary income) that one assumes the likelihood of defaults occurring to be remote. (Exhibit T–4, p. 4).

Hirsch testified in response to what alternative provisions, if any, Barclays made at the inception of the loan for liquidation of its collateral in the event it was necessary as follows: "Pursue the investors." (Exhibit T–3, p. 137).

Hirsch testified that if Barclays was successful in obtaining a judgment against note obligors in the litigation, "some will be collected and some will not be collected", that there would be cases of personal bankruptcy, but he had no idea which would not be collected, and that Barclays had not done any updated credit checks on the obligors, nor is there any subsequent analysis of investors' or obligors' circumstances. (Exhibit T–3, pp. 144, 146, 147).

Title 11 U.S.C. § 362(d) of the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984 (Bankruptcy Code) provides:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

Barclays asserts that relief from the automatic stay should be granted "for cause" due to the fact that the Trustee has not provided to Barclays adequate protection of its interest in the Investor Notes within the meaning of § 362(d)(1), since the Trustee has not demonstrated that an equity cushion exists and in fact the value of the Investor Notes is *less* than the obligation

owing to Barclays and that alternatively relief from the stay should be granted under § 362(d)(2) based upon the fact that (1) the Trustee does not have an equity in the Investor Notes and (2) the Notes are not necessary to an effective reorganization.

The burden of proof on the issue of the debtor's or the estate's lack of equity in property rests with the party requesting relief, while the party opposing the relief has the burden of proof as to all other issues. 11 U.S.C. § 362(g). *See also, In re Trina-Dee, Inc.,* 731 F.2d 170, 171 (3d Cir. 1984); *In re Paolino,* 68 B.R. 416 (Bkrtcy. E.D.Pa.1986); *In re Bialac,* 712 F.2d 426, 432 (9th Cir.1983).

The disposition of the motion before the court requires a determination of the debtor's equity in the subject collateral. Under § 362(d)(2) relief from the stay can be granted only if the debtor does not have equity *and* the property is not necessary to an effective reorganization. *In re Bialac,* 712 F.2d 426, 432–33 (9th Cir.1983). Pursuant to § 362(d)(1) relief from the stay will be granted for cause, including, but not limited to, lack of adequate protection of the creditors' interest in the property.

Adequate protection is not defined in the Bankruptcy Code. Section 361, however, sets forth three non-exclusive examples of adequate protection:

> **Adequate protection.** When adequate protection is required under section 362, 363, 364 of this title of an interest of an entity in property, such adequate protection may be provided by—
>
> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

> (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

■ The Congressional purpose of this section is to "ensure that the secured creditor receives in value essentially what he bargained for." *See In re Ram Mfg. Inc.,* 32 B.R. 969, 971 (Bkrtcy.E.D.Pa.1983), *citing* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 339, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 6295.

The Ninth Circuit Court of Appeals in the case of *In re American Mariner Industries, Inc.,* 734 F.2d 426 (9th Cir.1984) examined the legislative history of § 361:

> The House Report emphasises the breadth of adequate protection:
>
> > It is not intended to be confined strictly to the constitutional protection required, however. The section, and the concept of adequate protection, is based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy laws. Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interest. Though the creditor might not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for.
>
> H.R.Rep. No. 595 at 339, 1978 U.S.Code Cong. & Ad.News at 6295.

>      .      .      .      .      .

> Value is another term intended to have broad scope in the context of providing adequate protection to secured creditors. The House Report stresses that the language of section 361 is directed toward

"the value of the protected entity's interest in the property involved."

The section does not specify how value is to be determined, nor does it specify when it is to be determined. These matters are left to case-by-case interpretation and development. It is expected that the courts will apply the concept in light of facts of each case and general equitable principles.

H.R.Rep. No. 595 at 339, 1978 U.S.Code Cong. & Ad.News at 6295.

734 F.2d at 431.

The existence of an "equity cushion" has been accepted by courts as an acceptable form of adequate protection. *See e.g. In re Carson,* 34 B.R. 502 (D.Kan.1983); *In re Hawaiian Pac. Industries,* 17 B.R. 670 (Bkrtcy.D.Hai.1982); *In re Wolford Enterprises,* 11 B.R. 571 (Bkrtcy.S.D.W.Va.1981).

■ In determining whether the debtor or the estate has an equity in property for purposes of § 362(d)(2), junior liens are relevant whether or not the lien creditors have been joined in the motion seeking relief from the stay. *Stewart v. Gurley,* 745 F.2d 1194, 1195 (9th Cir.1984). With respect to the question of an "equity cushion" arising under § 362(d)(1) for purposes of determining adequate protection, the junior liens are irrelevant. *See In re Mellor,* 734 F.2d 1396, 1401 (9th Cir.1984); *In re LaJolla Mortg. Fund v. Rancho El Cajon Associates,* 18 B.R. 283 (Bkrtcy.S.D. Cal.1982).

As explained by the *La Jolla* court:

"Equity" is the value, *above all secured claims* against the property, that can be realized from the sale of the property for the benefit of the unsecured creditors.... However, in considering whether the debtor has provided adequate protection for a creditor's secured claim, we are not concerned with the availability of equity for unsecured creditors. Instead, we are concerned with whether there is sufficient value in the collateral to protect the secured claim from diminution. A more apt and descriptive phrase would be "value cushion."

18 B.R. at 287–288.

It is undisputed in this case that NATCO's and NATCO Finance Co.'s indebtedness to Barclays on account of principal and interest alone approximates $5,842,-000.00. Barclays has incurred through February 1987 attorneys fees in connection with its collection efforts on the Investor Notes in the amount of at least $381,-000.00.

Section 506(a) of the Bankruptcy Code provides that the value of collateral is to be determined in light of the purpose of the disposition of the property. The legislative history of the section is illustrative as to the factors to be considered in a valuation analysis:

"Value" does not necessarily contemplate forced sale or liquidation value of collateral, nor does it always imply a full going concern value. Courts will have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interests in the case.

*See Matter of QPL Components, Inc.,* 20 B.R. 342, 345 (Bkrtcy.E.D.N.Y.1982), *citing* H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 356 (1977); U.S. Code & Admin. News 1978, pp. 5787, 6312.

The subject Investor Notes present unique valuation issues. The principal balance owing on the Investor Notes is in the approximate amount of $12,229,734.75. The value of those Notes, as testified to by Barclays' own expert, have value only if Barclays retains them and continues to go forward with its collection actions. Axon so testified before this court as follows in response to questions by Paul R. DeFilippo, Esquire, attorney for the Trustee:

By Mr. DeFilippo:

Q: Mr. Axon, is what you're basically saying that in your view there is no market for this portfolio of notes that Barclays holds?

By Mr. Axon:

A: There is no market to purchase those notes given the set of circumstances and variables that were described.

Q: You could not find a buyer for this portfolio, correct, as is?

A: I don't believe so, no.

Q: Which translates to it having a value of zero as a sale item, correct?

A: I'm saying there's no market, so—

Q: Well, if you can't find a buyer, what is the value of the property if on sale?

A: It has no value.

Q: It has no value. So, what you're telling us is Barclays' collateral has no value?

A: The collateral in this case is the notes?

Q: Right.

A: If under the circumstances that they are attempting to sell it to a third party, yes.

Q: Does it have a value to you other than sale value?

A: It has a value if Barclays retains it and continues to try to go forward with its collection activities.

Transcript of April 2, 1987, pp. 143–144.

Accordingly, the value of the subject notes is inextricably connected with the ability of Barclays to collect upon these Notes from the third-party makers or obligors. Litigation is now pending in other forums involving Barclays' suits against the individual obligors on these Notes, and in connection with actions brought by these same obligors against numerous defendants, including Barclays, in which Barclays intends to counterclaim for the amounts due on the notes. In all of these actions Barclays status as a holder in due course is an issue. The collectability of these note obligations, and so the value of this collateral, will ultimately be determined in the various litigation in which Barclays' holder in due course status has been challenged. In this respect this case is analogous to the case of *In re Bialac*, 712 F.2d 426 (9th Cir.1983). In *Bialac*, the Bialac family sold a large apartment project and shopping center to Harsh Building Company (HBC), a subsidiary of Harsh Investment Co. (HIC) in return for a "surplus cash" note payable by HBC. In a related transaction Harsh

Investment Company (HIC), made a loan to the Bialacs. A dispute and default arose on HIC's loan, and HIC received a state court judgment against 5 members of the Bialac family, jointly and severally. The judgment also gave HIC a security interest in the note. On May 22, 1981, HIC gave notice of its intention to foreclose on the surplus cash note it held as collateral for the $450,000.00 remaining due on its judgment. Prior to the sale James Bialac, who owned a one-sixth interest in the note, filed a petition in bankruptcy under Chapter 11. HIC proceeded with the sale of five-sixth interest in the note, preserving James Bialac's one-sixth interest. HIC was the only bidder and purchased the five-sixth interest in the note for $160,000.00, leaving a deficiency of approximately $300,000.00 on its judgment. James Bialac filed a complaint in the bankruptcy court seeking to have the sale set aside and HIC counterclaimed seeking to lift the automatic stay to allow it to foreclose on James Bialac's one-sixth interest in the note. The bankruptcy court voided the sale and refused to lift the stay in regards to James Bialac's interest in the note. The Bankruptcy Appellate panel reversed the voiding of the sale and remanded for further findings on James Bialac's equity in the note. The Ninth Circuit reinstated the decision of the bankruptcy court. The Ninth Circuit Court of Appeals noted that the bankruptcy court:

> found that the value of the note was not, at the time, quantifiable. It could not be determined whether James had any equity in the note. A separate action was proceeding. Final judgment in that action was necessary to determine the present value of the note, and whether James had any equity in it. The court felt it improper to lift the stay where the "side" litigation could establish an equity in the note. In addition, the court found the note necessary to an effective reorganization. The court refused to lift the stay.

712 F.2d at 429. In upholding the decision of the bankruptcy court, the Ninth Circuit stated:

It is agreed by everyone that James has no equity in the note if its present value does not exceed the amount of HIC's secured interest in it. The present value is subject to dispute. That determination depends on an interpretation of the note's terms. The interpretation is currently being litigated in the court of Arizona.

The bankruptcy court recognized this by finding that James "potentially" had equity. It then made a finding that "lifting the stay at this time could serve only to frustrate the implementation of a plan, and for this reason we deem the note to be necessary to an effective reorganization."

*Id.* at 432.

■ Here, as in *Bialac* it is clear that the estate has no equity in these Notes if their value does not exceed the amount of Barclays' interest in the Notes. The present value is, however, subject to dispute. The value, as testified to by Barclays' own expert depends upon the ability of Barclays to collect upon the Notes. This issue is being litigated in the federal court in Connecticut and elsewhere. This court will not duplicate those courts' efforts. Meanwhile, the estate has potential equity in these Notes of approximately $4,656,-000.00 based upon a principal balance owing on these notes of $12,229,734.00, Barclays' claim for principal, interest and counsel fees of $6,223,000.00, and the alleged lien of JLB Equities of $1,350,000.00.

Accordingly, Barclays has not shown that the estate has no equity in the Notes and is denied relief from the automatic stay under § 362(d)(2). Having so found, this court need not determine whether the Notes are necessary to the estate's effective reorganization under § 362(d)(2)(B). *See In re Bialac,* 712 F.2d at 432.

■ Barclays also seeks relief from the automatic stay on the basis that the Trustee has not provided Barclays adequate protection of its interest in the Investor Notes pursuant to § 362(d)(1). The Trustee clearly has the burden of proof on the issue of adequate protection. *See In re Gauvin,* 24 B.R. 578 (Bkrtcy.App.Pan. 9th Cir.1982).

Barclays argues that "regardless of the 'value' of the Investor Notes, there can be no 'equity cushion' in the Investor Notes to protect Barclays unless Barclays or the Trustee has the ability to collect that equity, that as long as Barclays is only a secured party, it can arguably collect only its interest in the Investor Notes under UCC § 3–302(4). The Trustee, on the other hand, will be unable to collect his interest in the Investor Notes unless the fraud allegations concerning the debtors in the class action lawsuits are without merit. If the Trustee is going to rely on an equity cushion as adequate protection, he should be required to demonstrate the falsity of the fraud allegations." *See* Barclays Trial Memorandum of Points and Authorities, dated February 17, 1987, at p. 7. Again these issues are being presently litigated in other courts. This court will not duplicate the efforts of those courts.

The court is satisfied that the potential equity cushion in these Notes of approximately $6,006,000.00 based upon a principal balance due on the Notes of $12,229,734.00 and Barclays' claim for principal interest and counsel fees of $6,223,000.00 affords Barclays adequate protection of its interest in those Notes at the present time.

This case can be distinguished from the case of *In re Ram Manufacturing Inc.,* 32 B.R. 969 (Bkrtcy.E.D.Pa.1983). In *Ram,* Ampro Corporation (Ampro), and Ampro-Scully, International, Inc. (ASI) were wholly-owned subsidiaries of Ram Manufacturing, Inc. (Ram). Ram and Apro filed for bankruptcy under Chapter 11 on January 7, 1983 and ASI filed under Chapter 11 shortly thereafter. Several years prior to the filing of the petitions, American Bank and Trust Company of Pennsylvania (the Bank), loaned Ram $300,000.00. Subsequently, this loan was increased to $500,000.00 and then to $700,000.00. The court noted that:

> In exchange for these loans Ram granted the bank a security interest in all existing and after-acquired accounts receivable, contract rights, chattel paper, machinery, equipment, inventory, general intangibles and proceeds thereof. In increasing Ram's loan from $500,000.00 to

$700,000.00, the bank requested and received the written guarantees of Ampro and ASI which were secured by the same type of collateral as that held by Ram. Ram is also indebted to the bank on a $440,000.00 loan granted under the aegis of the Montgomery County Industrial Development Authority ("MCI–DA"). Under this loan the bank holds a perfected security interest in Ram's accounts, inventory, machinery, equipment, furniture, furnishings, subleasehold improvements and fixtures purchased with the loan money. The aggregate indebtedness under the $440,000.00 and $700,000.00 loans totalled $1,176,942.00, including principal, interest and late charges as of May 18, 1983.

32 B.R. at 970. Moreover, the court found the value of the collateral available to the Bank to secure the indebtedness was $643,815.00, consisting of cash, inventory of component parts and finished goods, consoles, equipment and furniture. The Bank commenced a proceeding in the bankruptcy court to modify the stay to foreclose a mortgage on the debtor's real property. The Bank asserted relief could be granted due to the lack of a sufficient equity cushion protecting its security interest. The Trustee contended that the debtor's uncollected accounts receivables and numerous outstanding lawsuits against third-parties should be valued and considered in adjudicating the Bank's request for relief from the stay. The court noted:

> Since the bank has predicated its request for relief from the stay on § 362(d)(1) due to the lack of adequate protection of its security interest, the only collateral which can properly be considered is property which affords the secured creditor such adequate protection.

32 B.R. at 971. The court noted the legislative history § 361 stated the purpose of this section was to insure the secured creditor receives in value what he bargained for. The court concluded:

> Since security interests in unrealized accounts receivable and pending lawsuits are predicated on a third party's ability, or unsecured promise, to repay, they typically do not have sufficient integrity under § 361 to protect adequately a credi-

tor's eroding security interest in real property.

Id. at 972. In the present case, the issue is not whether interests which are predicated upon a third party's ability to pay provide adequate protection for a security interest in real property. In Ram, moreover, there was a specific finding that the value of the collateral was $643,815.00 to satisfy a secured indebtedness of $1,176,942.00. In the present case, this court is constrained to recognize the potential substantial equity that exists in the Investor Notes. Nor is this court dealing with a depreciating asset, such as real estate, equipment or machinery. The Investor Notes are accruing interest upon default and provide for the collection by Barclays of its costs of suit.

Barclays has been granted partial relief from the automatic stay to undertake collection actions on these Notes to sue investors, and to proceed to judgment and execution on same. Barclays is so proceeding to realize the value of its interest in these Notes by pursuing these collection efforts.

Accordingly, Barclays' motion for relief from the automatic stay to foreclose on the Investor Notes will be denied.

An order will be submitted in accordance with this opinion.